UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X

DANNY DALTON,

        Plaintiff,

- against -

THE CITY OF NEW YORK, NEW YORK CITY
DEPARTMENT OF INVESTIGATION and
DOMINICK ZARRELLA,

        Defendants.

----------------------------------------X

COMPLAINT

PLAINTIFF DEMANDS A
TRIAL BY JURY

Plaintiff Danny Dalton ("Dalton" or "plaintiff"), by his attorneys, Vladeck, Raskin, & Clark, P.C., complaining of defendants the City of New York ("the City"), New York City Department of Investigation ("DOI"), and Dominick Zarrella ("Zarrella") (collectively, "defendants"), alleges:

NATURE OF CLAIMS

1. Dalton began working at DOI, a law enforcement agency responsible for conducting independent investigations of City agencies, in 2019. As an Assistant Inspector General, Dalton was responsible for investigating misconduct by City agencies and government officials, including conduct which threatens public health and safety and conduct that constitutes an improper governmental action.

2. DOI completed an investigation of the City's Lifeguarding program in October 2019. The investigation revealed misconduct, negligence, and a lack of accountability within the program, posing a significant risk to public safety. In June 2020, Dalton became aware that DOI

had not published the investigation's findings nor made any effort to remedy the serious issues it had revealed with the Lifeguarding program.

3. After conducting his own investigation into DOI's inaction, Dalton made protected complaints, including a whistleblower complaint to the Public Advocate and City Council in May 2021. His supervisors at DOI and the executive team were also aware of his complaint. Shortly after Dalton complained, DOI fired him with no explanation.

4. Plaintiff brings this action against the City and DOI to remedy their retaliation against him for reporting conduct that violated a law, rule, or regulation which created a substantial threat to public safety and for reporting conduct that he reasonably believed to be true and constitutes an improper governmental action, in violation of New York Civil Service Law § 75-b ("75-b").

5. Plaintiff further brings this action to remedy defendants' retaliation against him for making protected complaints regarding sexual harassment and retaliation, in violation of the New York State Human Rights Law ("State Law"), N.Y. Exec. Law § 296 et seq.; and the New York City Human Rights Law ("City Law"), New York City Administrative Code, § 8–101 et seq.

6. Plaintiff seeks compensatory and punitive damages, injunctive and declaratory relief, and appropriate legal and equitable relief.

JURISDICTION AND VENUE

7. This Court has diversity jurisdiction over plaintiff's claims pursuant to 28 U.S.C. § 1332(a)(i) because the parties are citizens of different states and the amount in controversy exceeds $75,000 exclusive of interest and costs.

2

8. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), because defendants do business in this District, and a substantial part of the events or omissions giving rise to plaintiff's claims occurred in this District.

9. On May 25, 2022, Dalton filed a charge with the United States Equal Opportunity Employment Commission (the "EEOC"). Plaintiff intends to request a notice of right to sue. When plaintiff receives the notice of his right to sue from the EEOC, he will seek to amend the Complaint to add claims of retaliation under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. ("Title VII"). The facts set forth below support those claims as well, and therefore, there will be no prejudice to defendants by this procedure.

## PARTIES

10. Dalton is a resident of Lisbon, Maine. At all relevant times, Dalton worked as an Assistant Inspector General in the Department of Investigation.

11. Defendant City of New York is a municipal corporation.

12. Defendant DOI is a law enforcement agency of the government of the City of New York responsible for investigating fraud, waste, misconduct, abuse of authority, and unethical conduct in New York City. DOI's offices are located in Manhattan.

13. Defendant Zarrella has at all relevant times been employed as a Deputy Commissioner with DOI.

## FACTUAL ALLEGATIONS

### Background

14. Dalton has a background in law enforcement and extensive experience in investigating foreign corruption.

15. From 1991 to 1996 and 1998 to 2005, Dalton worked as a Special Agent for the United States Drug Enforcement Administration ("DEA") stationed in the United States, Pakistan, and El Salvador. In his role as a Special Agent, Dalton was responsible for investigating international drug organizations, collecting, and analyzing intelligence from multiple sources, and coordinating with U.S. agencies and foreign counterparts to arrest and prosecute high-level traffickers. Dalton was also responsible for training and supervising agents and intelligence analysts.

16. During his time with the DEA, Dalton received two awards for exceptional service and two letters of commendation from the Administrator of the DEA for outstanding performance of duty in two separate investigations.

17. From 2005 to 2006, Dalton was a Protective Security Specialist for Blackwater USA in Iraq. He worked as a contractor for the United States Department of State as a Detail Leader for a High-Threat Protective Security Detail in Iraq. He was responsible for the protection of U.S. diplomats and facilities at the U.S. Regional Embassy. As Detail Leader, Dalton's duties included effective planning, evaluation, implementation and management of security policies, practices, and procedures affecting locations, situations, or security levels by the security force.

18. From 2006 to 2008, Dalton worked as a Law Enforcement Advisor to the United States Army First Cavalry Intelligence Center at Camp Victory in Baghdad, Iraq, providing guidance and mentoring to military intelligence analysts targeting terrorist criminal cells operating throughout Iraq and partnering with field collectors to evaluate intelligence. Dalton received an award for meritorious service in support of the First Cavalry Division.

19.     From 2010 to 2011, Dalton served as a subject matter expert for the Director of Law Enforcement Information Sharing Initiatives at the Department of Homeland Security.  He assisted in the evaluation, development, and planning of policies and programs to facilitate the sharing of information between law enforcement entities.

20.     From 2013 to 2014, Dalton was a Naval Police Officer responsible for enforcing federal laws and ensuring the safety and security of the Naval Security Asset in Cutler, Maine.

21.     From 2009 to 2019, Dalton contracted his services as a law enforcement subject matter expert to United States law enforcement agencies and private companies, specializing in international drug and terrorist organizations.

Dalton's Employment with DOI

22.     Dalton joined DOI as an Assistant Inspector General in March 2019.

23.     DOI is a City law enforcement agency that investigates and refers for criminal prosecution unlawful activity by City employees, contractors, and others who conduct business with the City.

24.     DOI acts independently of the Mayor and City Council.

25.     DOI is divided into squads, led by one or two Inspectors General, each of which are responsible for investigating a specific agency or group of agencies.

26.     During Dalton's employment with the City, he worked on Squad 4, which was responsible for overseeing 22 City agencies.

27.     As an Assistant Inspector General, Dalton's responsibilities included supervising a group of investigators and guiding them on their investigations.

28.     Dalton reported to different supervisors depending on which agency was the subject of the investigation he was overseeing at the time.

29. Dalton's primary supervisors were Inspectors General Ann Petterson ("Petterson") and Clinton Daggan ("Daggan").

30. Throughout his employment with the City, Dalton was not aware of any problems or complaints about his performance and never received a written or oral warning about any performance problems.

Squad 4 Substantiates Complaints of Gross Misconduct within the Parks Department

31. For many decades up to and including during Dalton's employment in DOI, the City Department of Parks and Recreation ("DPR"), and, in particular its Lifeguarding program, was plagued with unlawful conduct.

32. DPR's Lifeguarding program performs the critical public safety role of protecting people who swim at City beaches and pools from the risks of drowning and injury.

33. DPR Lifeguards oversee New York City's 15 miles of beach and more than 50 public pools.

34. The City was beset by allegations of corruption within the highest ranks of its Lifeguarding program and serious safety concerns that have resulted in an inordinately high fatality rate at the City's pools and beaches.

35. Among other problems, the City had failed to put in place appropriate disciplinary processes to address lifeguard misconduct involving the City's lifeguards, including sexual misconduct and serious safety violations that have jeopardized the health and safety of the public.

36. For the most part, the City had turned a blind eye to the concerns of the public and City employees who have reported that lifeguards have engaged in unlawful and dangerous misconduct, protected the perpetrators, and allowed them to remain City employees.

37. Although the pattern of misconduct gave rise to numerous complaints and lawsuits by City employees and residents, the City and the DPR did little to reform the Lifeguarding program.

38. Lifeguards within the program who complained about safety issues or wrongdoing by coworkers faced retaliation.

39. Because of the lack of response from DPR to concerns raised about the Lifeguarding program, citizens and employees began reporting their concerns directly to DOI.

40. Several months before Dalton joined DOI, Squad 4 began an investigation into the major problems with the Lifeguarding program.

41. The DOI probe focused on Richie Sher ("Sher"), who was until recently the City's longtime Lifeguard Coordinator; and Liam Kavanagh ("Kavanagh"), who has served as First Deputy Commissioner of DPR since 2002.

42. DOI's investigation included an extensive inquiry into the allegations of sexual harassment and sexual assault and other allegations concerning a lack of oversight and disciplinary processes to address misconduct and safety violations.

43. Even though Dalton was not assigned to the investigation, he read materials concerning the investigation around the time he began working for DOI.

44. Dalton also had discussions about the investigation with other members of Squad 4 from time to time.

45. In or around October 2019, Squad 4 submitted to the DOI's executive staff its report concerning the DPR investigation.

46. The October 2019 report substantiated many of the complaints against the Lifeguarding program, including negligence and other wrongdoing by the program's leadership.

47. At the time, the DPR was under the purview of Squad 4, which investigated the allegations and issued the report.

48. As set forth above, Dalton was not involved in the DOI's initial investigation or report.

49. After Squad 4 finalized its report, Dalton reviewed the report in or around October 2019 and discussed the report with colleagues.

50. The investigation was subsequently transferred to Squad 10 but, on information and belief, no additional work was completed.

Defendants Fail to Act In Response to the Report

51. During Dalton's tenure, completed reports were generally given to DOI executive leadership to review; the Department Commissioner determined whether to publish a completed report.

52. Margaret Garnett ("Garnett") was Commissioner of DOI at the time Squad 4 submitted its DPR in 2019.

53. Executives within DOI were obligated to act upon reports as soon as possible.

54. DOI often published reports within days or weeks of completion, particularly where that report involved issues of public safety.

55. DOI did not publish the Squad 4 report concerning DPR for over two years, nor did it take any action to remedy the many issues the report described.

56. Although Squad 4 submitted the report in October 2019, DOI published it in December 2021, after defendants had fired Dalton.

57. The December 2021 report included 13 recommendations to address the problems that it identified within the Lifeguarding program.

58. On information and belief, none of those recommendations have been implemented, despite the ongoing risk to public safety.

### Defendants' Ongoing Failure to Address the Serious Problems

59. In June 2020, New York Magazine published an article detailing the years of misconduct in the Lifeguarding program, including corruption, high drowning rates, wrongful death lawsuits, drinking and drug use, rampant sexual abuse within the lifeguard's ranks, and retaliation against lifeguards who made complaints, including concerning safety issues.[1]

60. Following the publication of the article, on information and belief, DOI Commissioner Garnett organized a group of DOI staff for a conference call about the inquiry into DPR.

61. The call took place on or about November 20, 2020. Dalton was not present at the meeting on November 20, 2020, but discussed what was said at the meeting with colleagues.

62. During that meeting on November 20, 2020, on information and belief, the investigators joked about the New York Magazine article.

63. One male investigator stated, "[i]t made me think that it would've been cool to be a lifeguard."

64. Another male investigator responded, "Unless you're on the other end of it, in the water drowning and you really needed a lifeguard."

65. Garnett added, "Or you're like, a 19-year-old girl in your first summer job and these clowns keep, like, touching your breasts while you're at work."

---

[1] See Boss of the Beach, New York Magazine, June 23, 2020. Available at https://nymag.com/intelligencer/2020/06/peter-stein-nyc-lifeguards.html?regwall-newsletter-signup=true.

66. Investigators also referenced retaliation against lifeguards who reported serious misconduct and safety concerns, including sexual harassment and drinking and drug use by lifeguards on duty.

67. The investigators also joked about sending an investigator undercover as a lifeguard.

68. During that same meeting on November 20, 2020, on information and belief, the investigators discussed their finding that Kavanagh repeatedly protected lifeguards and other DPR employees accused of sexual harassment and other misconduct.

69. Among other things, during the November 20, 2020 meeting, Garnett stated:

> I know from the Squad 4 investigation — a lot of sexual shenanigans in the lifeguard division. Just in terms of, like, you know, harassment of younger female seasonal lifeguards and complaints just being swept under the rug, or, like, then the girl who complains gets transferred, you know, to a less desirable location, and the person who's doing the harassing, like, absolutely nothing happens.

70. During the same November 20, 2020 meeting, on information and belief, investigators also discussed a finding that, after one male lifeguard was arrested for sexually assaulting a young girl, the City's former Lifeguard Coordinator Sher allegedly said, "something like, 'Oh well, it's probably a misunderstanding,' or, 'He's a good kid.'"

71. Dalton attended a follow-up conference call about Squad 4's report on March 2, 2021.

72. During the March 2, 2021 call, a group of investigators and two Inspectors General continued to discuss the major problems within DPR.

10

73. Although the group agreed that Sher should be removed and Kavanagh stripped of his disciplinary duties, the group failed to discuss or agree upon any concrete action that DOI would take to implement those suggested changes.

74. One investigator even complained during the March 2, 2021 call, "DOI has a long history of . . . looking into various criminal aspects of the DPR and coming up with a result, coming up with policy suggestions. And then it hits a dead end and it goes nowhere and then we pick it up again in [10] years."

<u>Dalton's Investigation and Protected Complaints</u>

75. Beginning in 2020, it became clear to Dalton that DOI would not do anything to remedy the unlawful conduct within the lifeguarding program, as the executive leadership had failed to finalize and make public the DOI report in a timely manner.

76. Several months after Squad 4 completed its investigation, DOI had taken no steps to act upon the report's findings to remedy the serious issues within the Lifeguard program.

77. Concerned about the continued threat to the safety of the lifeguards and the public, Dalton took it upon himself to further investigate. He looked at the reason for the delay in publishing the report and the delay in acting upon the findings of the DPR investigation, which revealed major public safety concerns, including sexual harassment and actions that jeopardized the health and safety of the public.

78. Dalton began his investigation after June 2020.

79. Dalton ultimately concluded that the DOI had engaged in gross mismanagement by failing to address the findings within DPR, including findings of rampant sexual harassment, a lack of discipline and oversight within the program, and a need to better address safety concerns and promote proper qualifications and training for lifeguards.

80. On or about May 25, 2021, Dalton reported his findings in a written complaint.

81. Pursuant to the requirements of the New York City whistleblower law and his training as an Assistant Inspector General, Dalton submitted the complaint to three members of the City Council and to the Public Advocate's office.

82. In the written complaint, Dalton explained his conclusion that DOI, including Commissioner Garnett; First Deputy Commissioner Daniel Cort ("Cort"); Deputy Commissioner Zarrella; and Inspector General Andrew Brunsden ("Brunsden"), had engaged in gross mismanagement by delaying and covering up the findings of the 2019 investigation.

83. Dalton objected, among other things, that Kavanagh had faced no disciplinary action and that the DPR had been allowed to continue its pattern of ignoring misconduct within the Lifeguard program, placing the public at risk.

84. Dalton concluded, ""[t]he fact that the DOI executive team has not finalized the investigation or acted on its findings continues to place the public and employees at risk."

85. None of the officials to whom Dalton complained ever spoke with him about his complaint or otherwise responded, other than (in the case of one Council member and the Public Advocate), to confirm receipt of his complaint.

86. Dalton told his supervisor Inspector General Petterson about his complaint shortly after he made it.

87. Inspector General Daggan, Dalton's other supervisor, was also aware of his complaint.

<u>Defendants Retaliate Against Dalton</u>

88. Shortly after Dalton complained, defendants retaliated against him.

89. On or about July 28, 2021, Deputy Commissioner Chief of Investigations Zarella, whom Dalton had identified by name in his complaint, demanded that Dalton meet with him for an interview about the DPR investigation. Zarella is a member of the DOI executive team.

90. Dalton met with Zarella on July 29, 2021.

91. Zarella told Dalton the interview was being recorded.

92. Prior to July 29, 2021, DOI had never forced Dalton to speak with a member of its executive team during a recorded interview.

93. Dalton considered the compelled interview to be an attempt to intimidate him.

94. During the interview, Dalton answered some of Zarella's questions about the investigation into DPR.

95. During the interview, Dalton notified Zarella of his protected complaint about the DOI's mishandling of the issues related to DPR. Dalton told Zarella that over the previous year, Dalton had investigated the DOI's mismanagement and that he had recently submitted a whistleblower complaint to the Office of the Public Advocate and to City Council members.

96. Dalton objected to Zarella forcing him to sit for a recorded interview and stated that he believed it was in retaliation for his whistleblower complaint.

97. Zarella responded that he had not been aware of Dalton's whistleblower complaint "until yesterday."

98. After Dalton told Zarella about his protected complaint and further complained of retaliation, defendants swiftly doubled down on their retribution against plaintiff.

99. Immediately after his interview with Zarella, defendants placed him on a paid leave of absence.

100. Approximately one week later, on August 4, 2021, defendants fired Dalton.

101. DOI gave no justification for firing Dalton. At the time of his dismissal, Dalton received a letter from the DOI's Deputy Commissioner for Operations, stating, "[a]s you are aware, you serve in an at-will position, and may be released from employment without cause."

102. On information and belief, defendants fired Dalton because he had disclosed to New York City Councilmembers and to the New York City Public Advocate and complained to City officials about, inter alia, misconduct within the New York City Parks Department, including sexual harassment and conduct that jeopardized the health and safety of the public; and defendants failure to take corrective action, including their delay in publicizing Squad 4's report and in taking remedial action to protect the public.

FIRST CAUSE OF ACTION
Civil Service Law §75-b – Whistleblower Retaliation
(Against the City and DOI)

103. Plaintiff repeats and realleges paragraphs 1 through 102 above.

104. By the acts and practices described above, the City and DOI defendants violated CVS § 75-b when they retaliated against plaintiff by firing him because he reported conduct that violated a law, rule or regulation that creates a substantial threat to public safety and/or conduct that he believed constituted an improper governmental action.

105. The City and DOI were aware that their actions violated CVS § 75-b. Their violations were willful and not in good faith.

106. Plaintiff has suffered and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional distress, humiliation, and other compensable damages as a result of defendants' unlawful practices.

## SECOND CAUSE OF ACTION
### State Law – Retaliation
(Against All Defendants)

107. Plaintiff repeats and realleges paragraphs 1 through 106 as if fully set forth herein.

108. By the acts and practices described above, defendants, in violation of the State Law, retaliated against plaintiff because of his protected complaints.

109. Defendants engaged in retaliation with willful or wanton negligence, with recklessness, and/or with a conscious disregard of plaintiff's rights or conduct so reckless that it amounts to such disregard.

110. Plaintiff has suffered and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional distress, humiliation, and other compensable damages as a result of defendants' discriminatory practices.

## THIRD CAUSE OF ACTION
### City Law – Retaliation
(Against All Defendants)

111. Plaintiff repeats and realleges paragraphs 1 through 110 as if fully set forth herein.

112. By the acts and practices described above, defendants, in violation of the City Law, retaliated against plaintiff because of his protected complaints.

113. Defendants engaged in retaliation with willful or wanton negligence, with recklessness, and/or with a conscious disregard of plaintiff's rights or conduct so reckless that it amounts to such disregard.

114. Plaintiff has suffered and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional distress, humiliation, and other compensable damages as a result of defendants' discriminatory practices.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff respectfully requests that this Court enter a judgment:

a. declaring that the acts and practices complained of herein are in violation of the Civil Service Law;

b. enjoining and permanently restraining these violations of the Civil Service Law;

c. directing defendants to pay plaintiff compensatory damages, including damages for loss of earning potential, emotional distress, humiliation, and pain and suffering;

d. directing defendants to pay an additional amount as punitive damages for their willful and/or reckless disregard of Plaintiff's statutory rights;

e. awarding plaintiff reasonable attorneys' fees and costs;

f. awarding plaintiff such interest as is allowed by law;

g. awarding plaintiff damages for any adverse tax consequences stemming from an award; and

h. granting plaintiff such other and further relief as the Court deems necessary and proper.

## DEMAND FOR A TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, plaintiff demands a trial by jury in this action.

Dated: New York, New York
August 4, 2022

VLADECK, RASKIN & CLARK, P.C.

By: _____
Jeremiah Iadevaia
Susanna Barron
Attorneys for Plaintiff
565 Fifth Avenue, 9th Floor
New York, New York 10017
(212) 403-7300